Good morning. May it please the Court, my name is Katherine Kimball-Windsor and I represent the appellant in this case, Ms. Martinez. This was a very short trial. It was a trial that involved four witnesses. The defense waived opening statement and did not put on a case. And it lasted essentially part of an afternoon, part of a morning, and the arguments and instructions spilled over a little bit, I think, into one afternoon. Only one of the four witnesses who testified was cross-examined. And for that one witness who was cross-examined, the district court restricted the scope of cross-examination. And that's the issue that I'd like to address first, the Confrontation Clause issue. At trial, the defense lawyer attempted to cross-examine the cooperating co-defendant about the one benefit that she was receiving for her testimony, which was that the three-year mandatory minimum count was to be dismissed. And the district court sustained the government's objection and told the defense counsel that he couldn't ask specifically about the three-year mandatory minimum because it raised the issue of punishment. And by doing that, he restricted the scope of cross-examination in violation of Ms. The witness who was testifying was testifying through a Spanish-language interpreter. She had a lot of comprehension problems. And because the defense lawyer was not allowed to say, isn't it true that you are looking at a three-year mandatory minimum and that as a result of the only way you could get less than this three years, than the three years, is to testify here today? And because the district court had the or forced the defense lawyer to talk about more serious charges and less serious charges, essentially that, that the scope of that cross-examination was, was completely Well, isn't the real problem the fact that the answer that he wanted to elicit wasn't forthcoming? Well, not, not a restriction on the scope, but rather that she, for whatever the reason, just didn't get it and didn't answer the question the way he wanted her to answer it. Well, it's absolutely true that she was very confused by the questions. Well, but that's not a confrontation clause problem. That's just that she didn't answer the question the way he wanted it answered. Well, if he had been able to say, isn't it true that you were looking at three years, that you couldn't get less than three years, that, that's very different than having to say, you know, do you remember seeing this thing called an indictment and there were two charges in it and one was more serious and one was less serious and she just Well, I suppose he could have said you got a real break in, in your, in the sentence that you could have gotten. I mean, he could have said that. I mean, there are lots of ways you can phrase the same question without using the number of years. Well He could have said you got, you got, you knew, you knew in exchange for your testimony that you were going to get a real break at sentencing. But the number of years is really the, the important fact, because the jury's entitled to, to find out what kind of benefits the witness is getting in exchange for her testimony. Otherwise, defense lawyers would just be always stuck with saying, isn't it true that you're getting a benefit here from, from testifying? And without knowing what that benefit is, it, it really has no meaning. And cross-examine is really, cross-examination is the heart of the confrontation clause. And, and eliciting All the district court said was you can't talk about the three years itself. You can, if you're smart enough as a lawyer, you can find a million ways to ask, ask her questions, but you can't mention the time. I think that's what the district court said. That's absolutely true. And what he was concerned with that, with the, that the jury would then know what Ms. Martinez was facing. But that could That's unduly prejudicial. Well, that is an evidentiary rule. And it's asking that an evidentiary rule trump a constitutional concern. Doesn't it, isn't that the case? I mean, the confrontation clause doesn't mean a defense attorney can ask any question he wants, regardless of the evidentiary rules. Well, that's true. But the Supreme Court has, has really held that, that especially in, in eliciting bias, that that's the most important, that's the heart of the Confrontation Clause right. And when you restrict it in, in such a way, the jury doesn't really learn what the bias is. Frankly, what's important here is that, that she couldn't get less than three years. That amount of time was Well, the whole thing is it doesn't even matter what the nature of the charge was. All you had to elicit, you didn't, the jury didn't even have to know that it was the same charge that the defendant was up on, you know. I mean, all that had to be elicited was that she was charged with, with crimes that she managed to plead herself out of, significant exposure, in exchange for her testimony for. Well, I think, I mean, the three, the, the amount of time, the, the concern about the evidentiary concern certainly could have been cured by a limiting instruction. The jury's instructed, you can't consider, consider punishment in, in reaching your verdict, and we assume that the jury follows that instruction. Maybe we should just switch gears, because I understand what you're saying. I, I, I don't exactly agree, but it doesn't matter a whole lot, because isn't the bottom line that no matter what, we just had, I mean, you're facing kind of a slam-dunk case here. So, so the fact that, that Estrada didn't give a, a particular answer, I mean, she's kind of a, almost irrelevant anyway. I mean. I think it's, I mean, looking at this record, especially with what the defense lawyer did, it's, I mean, I certainly can't stand up here and tell you that this was an, an easy defense case, or that it wasn't a strong government case. That's not, that's not true. But looking back on it, you know, with, at the, looking back at the record, what stands out is just that the defense lawyer really didn't do anything. And so it, it's hard now to say that this is what. But he had some good reasons for, for not doing something. But, you know, we don't know that without a record. Well, we don't know what could have happened had he crossed, had he chosen to cross-examine those first three witnesses. It appears from the record that there were things that could have been elicited that were important to bring out. I mean, he, he chose not to, to cross-examine the material witness who was, I mean, just with any material witness who's testifying, there's this obvious benefit that she's, wasn't being charged with illegal entry in exchange for her testimony. And he didn't bring that out at all. In this case, she hadn't, she had been shown a photo lineup at the border, and she was not able to pick Ms. Martinez out of that lineup. And yet the defense lawyer did not cross-examine on that at all. Who is she? I'm sorry? Who, who you said she. Oh, the. Somebody she in this case. You're right. The material witness was shown. The lady in the dashboard. The lady in the dashboard was shown a photo lineup and did not identify Ms. Martinez as being present. And yet. From which we gather that, what, from which the jury would say, ah, well, Martinez must not have been in that van then. Well, we, we don't, there wasn't any dispute that she was in the van as it crossed the border. But the crucial, the two crucial elements here are certainly knowledge, whether she knew the material witness was there. And second, whether she was aiding and abetting, whether she was actually participating in the crime as opposed to being merely present. I'm getting $400 for crossing the border with somebody stuffed in the dashboard which she knew about. I mean, that, that, that's what the government's charge was, was that she. That, that's just an absolute fact. She, she, she confessed, I believe, to the $400. She knew the alien was in the dashboard and they were crossing the border with her. Now, I understand. A person would say, well, maybe the lady just likes to travel in dashboards. I don't think there's anything wrong with that, especially. But she knew that, right? No. I mean, well. No? She didn't testify at trial. So what we have are, there are four witnesses. And there was a, she had given a post-arrest statement where she had initially denied knowing that the material witness was there and said that she had gone down to Mexico with her girlfriend or a friend of hers to go dancing. And after repeatedly she was told, you're lying, we don't believe you. At that point she confessed and gave a statement saying that she was being paid. But there was a lot of conflicting evidence. The witness, the witness spoke to the people in the van from inside the dashboard and said, you know, it's really uncomfortable here, it's hot. Indeed, if somebody wanted to dispute that, that seems to me undercuts your other point that somehow the condition of the witness should not have been brought out in evidence. But that demonstrates that's what the witness did all right. She said, you know, I'm really hot and uncomfortable. And your client said, well, isn't that interesting, the van dashboard speaking to me. Well, but the defense lawyer never challenged, the defense lawyer didn't cross-examine those witnesses. And, you know, standing here today, I don't know what she would have said had she been cross-examined. There were certainly conflicting statements that she gave. On the record that were left, you're right, it looks overwhelming. But that's in part certainly because the defense lawyer didn't challenge any of the testimony, even when it could have been challenged. And so it's. But the record is what we've got, isn't it? Correct. But one of the issues that I've raised is an ineffective assistance of counsel charge. There we are. Now, it seems to me that that generally is why people raise those kinds of issues, because then you bring in the defense lawyer and you say, look, why in the world didn't you cross-examine this witness? And the defense lawyer would say, oh, because if I had, I would have really heard some bad stuff. I don't know what the defense lawyer would say. I mean, again, we're speculating on all sides of this thing. But there may have been some horrible stuff out there he might have heard. We don't know. Maybe he would have just said, well, I was just too lazy. That would be nice, but we don't know that. Well, it's true that this Court typically doesn't consider claims of ineffective assistance of counsel on direct appeal. And there are many reasons for that. But as was cited in the reply brief, sir, there are situations where this Court does and has in the past done it. And this is a situation where there's just so many errors, so many things that the defense lawyer didn't do that are, frankly, obvious. I mean, there's no downside in cross-examining the material witness and saying, isn't it true that you entered the country illegally? And isn't it true that that's a crime? And you just don't see where that gets you. That's the problem. I mean, even if shh, I can't imagine what she could have said that would have had any effect on the facts that are just thoroughly established. Well, you know, it's because of the very quiet record, it's, you know, all of the issues that I've raised are on plain air. And that certainly makes my life quite a bit more difficult. But that is because the defense lawyer just didn't object, signaled to the district court ahead of trial that I don't want to be trying this case. And the district court was obviously concerned about it and actually said to him, you know, look, are you going to cross-examine this last witness? I think you should. And after that, you know, he finally did stand up and do some cross-examination. But Ms. Martinez didn't get a fair trial. And certainly, you know, this wasn't an easy case, and I'm not going to say that it was, but we just don't know what would have happened had he actually stood up and raised some reasonable doubt about whether she was going to be paid. There was conflicting evidence about that. She confessed to that? Am I wrong? Well, she at sentencing, the defense lawyer said that she had been pressured into saying that she was being paid and that she really wasn't being paid. And the co-defendant said her confession. Didn't she say she was? She did say in her post-arrest statement. Did the defendant testify that she was going to be paid? She testified that she hadn't told her exactly. She said first it was $400, and I think she changed it to $200. And then she said she couldn't say exactly. Or make it two, make it three. It doesn't matter if she's going to get $50 or $0.10. She was going to get paid for doing this. Well, I think the fact that there was conflicting testimony about what that payment might be means that there was some potential reasonable doubt there. The co-defendant was not credible about that. The co-defendant is not credible, and she's also lying when she says she's going to be paid $400, right? You know, I know that looking back on it without any cross-examination, it's hard to say what could have been done. But these cases are very triable cases, and trial lawyers deal with these facts all the time. I mean, statements, it's true that when you have an unchallenged statement, that's very problematic. But when you have a statement that's challenged through cross-examination by a competent defense lawyer. You know, when I was hearing trials, some of the most competent defense lawyers I've ever seen didn't ask a bunch of questions to irritate the jury with things like, well, how do I know you were in the dashboard, or things like that. I mean, they just didn't ask a lot of questions. Sometimes they'd let them go down with almost no cross-examination at all, and they felt they were there, I gathered, they thought they were there to, in case the government tried to pull some fancy move. And if nothing fancy was done and it was just going down the way it shows, they wouldn't get up and squat. You're absolutely right that there are times when asking, you know, not asking a question is the best possible thing you can do. This was not that case. I mean, there were certainly. I think it would be great to avoid as much as possible emphasizing the fact that this lady was in the dashboard of a van coming across the border in the heat. Well, that was really, I mean, that was a fact that you couldn't change. Well, you can't change it, but you can sure try to not emphasize it. Well. The more you focus on her, the more you emphasize kind of how unfortunate the conduct of the people was who were smuggling her overs is not a pretty picture. Well, the woman who was driving had pled guilty, and had taken responsibility for being the person who actually brought her in. And the question was, was what Ms. Martinez was doing there? Was she aiding and abetting? Was she merely present? Was she down there to go, was she there to go dancing? I've addressed the two issues that I see in the confrontation clause, and I could, I'm not sure if there's anything, other questions you have. I'd be glad to answer any questions, or I can sit down as well and reserve the rest of my time. Actually, I have one. You raised the issue about the references to the aliens being hot and sweaty. Yes. It may well be that the agent's testimony to that effect falls within Gonzalez Flores, but I don't understand how it all does or how it matters, because she said that she said she was tired and hot, and it seems to me that goes directly to your client's knowledge that the alien was in the car. I think that one question does. So it just becomes cumulative then to have the agent testify to the same thing. Well, but it was repeatedly brought out, and it was brought out. It didn't, I mean, what the government needed to bring out was that there was some conversation, and what that conversation was wasn't important. True. And so the fact, and it was brought out in a way to say, I think the government lawyer even asked, were you hot? And then in stated in the opening, you're going to hear that the material witness was hot and sweaty, brought out through the primary inspector. She was, she appeared dehydrated. Her skin was clammy. I mean, I can, if it were just that one question, I think, you know, I wouldn't have raised the issue, but it was just, this was a short trial. Not a lot happened, and again and again and again the jury was told, you know, she was in this horrid condition. And this is an issue which, you know, in San Diego is a pretty, I don't know, hot issue, as it were. So it's something that I'm sure that the government was aware of. Defense counsel wasn't aware of it, obviously, because he didn't object or raise the issue, but I'm sure this Court has seen these claims multiple times. So there's really only one reason to bring it up repeatedly in that way, and that's to tell the jury, look, this woman was in this really horrible situation, and to raise that bias or to raise that kind of prejudicial evidence. Thank you. Good morning. My name is Rebecca Young. I'm an assistant U.S. attorney with the Southern District of California, and I'm accompanied by Assistant U.S. Attorney Luella Caldito. I'll be handling the first three issues presented in this appeal, whether or not it was error to allow the admission of testimony regarding the concealed alien's physical condition while she was in the dashboard of the car, whether the Court unduly restricted defense counsel's ability to cross-examine Ms. Estrada, the co-defendant, about her plea agreement, and whether or not trial counsel provided ineffective assistance of counsel. Ms. Caldito will handle the remaining three issues, and I'm going to try to button my lip after 10 minutes so that she can come up and address those three. Just because you have the 10 minutes, there's no court rule that says you have to consume them either. Oh, and there's a timer right here, too. Are there questions with respect to the first three issues that the Court would like me to address, or shall I just go through the arguments in order? With respect to the material witnesses of the concealed alien's physical condition, this case is clearly factually distinguishable from Gonzales-Flores. It's not very. Well, in Gonzales-Flores, you had two, you know, you had the kind of the two prongs that were missing here. You had zero probative value, because knowledge could not have been at issue. It was a foot guide case. So obviously the government did not have to show that the foot guide was aware of the alien's presence. So there was no probative value, whereas knowledge was at issue in the trial in this case. And the testimony that was elicited in Gonzales-Flores was far more prejudicial than what was elicited here. I mean, the facts were more prejudicial to begin with, and then the government chose to really highlight them and emphasize them in the closing argument, really making out the defendant to be this horrible person who had almost allowed these two young women to die in the desert. And not only were the facts in our case far less egregious, but they were also far less emphasized by the government in this case. But, you know, and as we noted in our brief, even in Gonzales-Flores, we had no probative value and far more prejudicial effect of the testimony. It was this Court still deemed that to be harmless error. And what was the relevance of the relevance that she was hot and sweaty, I take it, is to support her testimony that she did speak from the dashboard and say I'm hot and sweaty. It was used to demonstrate that, because what the defendant had done was relay the alien's condition to the occupants of another vehicle. Correct. That happened, too, I gather. Yes? Yes. Yes. Okay. So it was used to demonstrate that the defendant had knowledge of her presence, and, of course, that supported. Well, the alien already testified. She had testified. I talked to her, and then there was testimony that she had conveyed that information to somebody else. So there's the knowledge of her presence. Hot and sweaty is to do what? Well, I mean, that was what she had said. But, I mean, I think you're right to the extent that it could have, you know, she could have said anything. I mean, what was relevant was the fact that she had said something and that that message, and then the defendant conveyed that message to somebody else. So presumably, some touching on she was hot and sweaty underscores the truth that she actually did say, I'm hot and sweaty. Right. I understand that. I didn't see that argument in the brief, but I understand that that's a possibility. What was all the rest of it for? Why were we carrying on about it, putting as much emphasis on it as we could have? Well, I guess my reading is that. Besides plain old prejudice, and I understand that lawyers always like to prejudice one way or the other if they can. You know, also at the time of the trial, Gonzalo's floors hadn't been handed down yet. So the indictment still had the special allegation that would have required the government to introduce evidence of the physical condition of the concealed alien in order to meet the requirements of what was alleged in the indictment. I think in a perfect world to completely sanitize it, the government could have said, did the, could have just elicited that the concealed alien spoke to the defendant and whatever she said to her was then conveyed to somebody else. That shows the defendant's knowledge of her presence. To completely sanitize it and remove any reference to her condition. But in a pre-Gonzalo's floors trial, it probably was not clear to the government that that was the safest route to go. I'm not saying the government's evil. Maybe it was or wasn't clear to them. But the question is why they had to put in that much. I guess my reading of the transcript is that it wasn't, it was raised, I want to say three or four times. It was touched upon in closing argument. But when compared to the, when compared to Gonzalo's floors and the extent to which it was hammered home to the jury in that case, I didn't see it, I didn't see this case as on all fours with Gonzalo's floors. They're really even close. It's along the continuum. But it's certainly not on all fours with Gonzalo's floors. And as we pointed out, I mean, you know, even with the admittedly prejudicial testimony that was elicited in Gonzalo's floors, this Court did deem it to be harmless error, given the overwhelming evidence in that case. And, of course, as you've already noted, there was overwhelming evidence of the defendant's guilt in this case as well. And wouldn't the standard in this case be plain error? Yes. Was that the case in Gonzalo's floors? It wasn't. It was harmless. It strikes me as an even bigger difference between this case and that one. Exactly. The burden shifts to the defendant to show why there was not, why there was error in this case. With respect to the second issue in this case, again, you've, I think, brought out all of the points that we would. Well, yes, except you probably wouldn't bring out the point that saying how much time somebody gets a break for is probably the most single potent weapon that the defense has on cross-examination of a thing. Well, I think a reading of the transcript, and as appellate counsel acknowledged, really does demonstrate that this witness, she barely understood. I actually don't think she understood at all. Well, I understand to the extent that she didn't understand, it almost makes it all the more important, doesn't it, to be able to say, look, let me just say, put this as plain and simple as I can. Your deal gave you, got you out of three years. I don't know that her answer would have been any more clear than her answers were given the court, you know, and he spent many pages of the transcript trying to get at it, and I think any trial attorney has had that, has had that experience where they're trying to extract an answer and it's just not happening. It certainly wasn't, I mean, the court did place those boundaries, but, you know, other than bringing out the precise year, he had free reign. But that she didn't even understand. Sotomayor, even though it's the same as the defendant is exposed to, as long as the jury doesn't know that the charge is the same and therefore can infer that the penalty is the same. Well, unfortunately, I think he brought up the charges, which were identical to the charges that the defendant was on trial for. And you run the risk, and I think this is what the district court judge was, was. But isn't that the way to condition the inquiry, so that you protect the cross-examination without prejudicing the defendant? I think that would have been another way to go. I mean, it would have been another tack that the district court judge could have taken to make it clear that he's not to inquire about the charges that she's facing, so that the jury doesn't make the connection. Otherwise, you run the risk of defense counsel communicating to the jury through the witness that here's the sentence that my client is facing. I understand that. But he didn't do that. So the question is, isn't it just plain, flat-out wrong to disallow a reference to the exact benefit that the witness got? I would concede that it was error for the district court to place that limitation on him, I think especially after noting that, noting the trouble that defense counsel was having getting that point across. But I do think that it was error. It was harmless error, because if you take a look at the witness, you know, you take your witness as you get them. And in this case, you know, she didn't understand that there were two charges. She didn't understand that one carried a harsher punishment than the other. What she probably understood is that she pled guilty and agreed to testify. Right. And she was going to get a benefit of serving a whole lot less time. That's the question that he wasn't able to ask in those terms. Well, actually, I think he was allowed to ask it. I mean, I think he could have framed it just like that. Well, you're facing three years otherwise, and you're not getting three years. Isn't that right? Well, and you're right. And the way the district court judge allowed him to say it was, you know, well, didn't you get a break? Aren't you looking at less time because of the plea agreement that you entered into with the government? He asked her that question. Aren't you getting less time? And she said, I don't know. I don't know. I mean, it's a little disconcerting to see that someone had pled out to something with very little understanding of what she'd pled out to. And, of course, this trial is taking place before she's sentenced, and she's expressly warned, and the government did elicit this at trial, that she really has no idea what her sentence will be. She obviously didn't understand that she'd avoided a mandatory minimum, but she still knows that she's facing the 10-year statutory maximum. So that's – and, again, you know, it's difficult for trial attorneys. You know, you witness – you take your witness as you get them. And this was a difficult witness for defense counsel, and he really did try his best, which actually segues into the ineffective assistance of counsel claim. And I think – I think the Court has hit upon the main problem with any IAC claim on direct appeal, which is we have – the record is very scarce at this point. The practical problem here is that unless we give some thought to that issue, can that duration in this country is likely to match exactly how long she's serving time? I mean, she's out of the country when she's let go. But, yeah. And practically speaking, once she's out of the country, how exactly is she supposed to pursue that habeas claim? That's true. Now, we don't have much of a record. This doesn't scream out a Hall of Fame performance by a defense attorney. It wasn't a great defense case to try to prosecute. Right. You did everything you could to make sure the judge understood, I'm not wasting your time, but my choice, Your Honor. She won't play out, so here I am. But that was unfortunate. So we just heard from your opposing counsel there really wasn't a defense being offered, and we should look at the IAC claim now. We don't ordinarily do so, but is this one of those cases where we should? I think it would set – I understand – practically speaking, I understand what you're saying, which is, you know, the claim really goes away when the defendant is removed from this country and when she's released from custody. Well, we don't know when that's going to happen, do we? I'm sorry? We don't know when she's going to be removed from the country, do we? Well, her release date, I think, is August of 2007 is the planned release date. And, you know, Justice Breyer – I could have detained her, Your Honor. Gosh, I thought we had just dozens of cases that come here all the time that have been gone through the immigration process and with the different claims, and then to the BIA and then to us, and people are here for years after you would have thought they were going to be removed. So how do we know the answer to that? You know what? I really don't. I mean, I don't know. You're sort of conceding that she's going to – as soon as she stops serving time, they're going to ship her out of the country. I just – Not in the system I've seen so far. Oh. Well, just from my limited experience, I've just – I have noticed that. It actually wasn't something that I had thought of until Judge Clifton had raised it. But it was – you know, this is just not the extraordinary case, and I think it would set a poor precedent to allow an IAC claim to be heard on direct appeal with the record that it's in the State that it's currently in simply because the defendant may or may not be removed after August of 2007. But it's – you know, this is not – the cases that counsel cited in which IAC claims are resolved on direct appeal don't involve – well, had records that really didn't need further development. They involved – they didn't involve strategic decisions. For example, a couple of the cases that she cited involved defense counsel's failure to confer an acquittal at the end of the government's case. Well, there's your record. You know, there's really not much more that needs to be developed. But I think, Judge Reimer, you hit upon what's missing here, and that's counsel's reasons for, for example, cross-examining only one out of the four witnesses. And in this case, he did cross-examine the most damaging defense witness, Ms. Estrada, and did the best that he could with her. But, you know, otherwise, there's no – there's nothing in the record that would demonstrate, for example, that her – that the portion of her confession that she says she was pressured into making was, in fact, coerced. There's nothing in the record that demonstrates that. There were no grounds to challenge the admission of her confession for that reason. There were no – obviously, the rest of her, the exculpatory portions of her confession couldn't come in. Character witnesses, we don't know who they were, what they would have said, what the discussions were. And the closing argument did try to raise the specter of reasonable doubt. So there – on the record, as it now stands, there is no effective assistance of counsel. With that, I'd like to have Ms. Caldito come up. Thank you. May it please the Court. Luella Caldito for the United States. The fourth issue that the appellant presented is whether or not she should be entitled to a new trial or at the very least an evidentiary hearing based upon her claim that the government and Estrada had an under-the-table agreement. And that request should be denied for two main reasons. One, the appellant failed to present any direct evidence of this undisclosed agreement, and two, the record is quite clear that all the benefits given to Estrada to testify at Martinez's trial was given to Martinez. The appellant concedes in her brief that she has no direct evidence of this undisclosed agreement between the government and Estrada, and she only alludes to highly suspicious circumstances. And these highly suspicious circumstances she's referring to is the fact that despite the government's recommendation of 15 months, the district court sentenced Estrada to 8 months. However, the mere fact that she received a lesser sentence is at most circumstantial evidence of an under-the-table agreement between. Well, I've forgotten the name of the case, but we have one that basically says, you know, when you raise a Brady challenge of this sort, that an appropriate thing to do is to remand for an evidentiary hearing. Well, in those cases, there was direct evidence of some sort of special benefit that was given to the witness that was undisclosed to the defendant. And I – if the case you're referring to is United States v. Blanco, in that case, a DEA agent testified in cross-examination and only came out in cross-examination that the confidential informant received a special parole visa. That was never disclosed to the defendant in that case. And because of that direct evidence showing that, yes, the confidential informant did receive something, and, yes, the defendant did not know about it, that's why this Court sent it down for an evidentiary hearing. But this is not the case in this case. And here, there are several references in Appellant's brief that she never received the modified plea agreement that would allow Martinez or Estrada to plead without the package disposition, that being allowing Estrada to plead without Martinez pleading. But the record is quite clear that not only did she – did the trial counsel represent to the district court that he received the plea agreement, but he cross-examined Estrada and did the best he could under the terms of those plea – of that plea agreement. So it's quite clear that all the benefits that were given to Estrada in that plea agreement were given to Martinez. So any assertion that the government withheld anything from Martinez should be completely discounted. And the record is also quite clear that the 8-month sentence given to Estrada was based upon the sentencing court's own discretion. I think in the sentencing hearing, it marks out that it was Estrada's request for a four-level cocoon departure.  And our position is that we are asking the Court to consider giving credit to Estrada for her testimony. That's something that the district court considered in addition to Estrada's social work history and lack of criminal history. And that was the reason for the 8-month sentence and not the 15-month sentence. Isn't that, at the end of the day, leave you, though, with kind of a queasy feeling because we've got the person who was the moving force in the violation serving eight months, and we have the defendant in this case, three-year mandatory minimum. Is there something wrong about that? Well, under aiding and abetting theory, the aider and abetter is just as liable as the principal. If you want to call Estrada the principal here and Martinez the aider and abetter, she's just as guilty or she's just as liable as Martinez or as Estrada, I'm sorry. And both of them did have the option to plead guilty, and she did exercise her right to go to trial. And that's just a consequence of that. And Martinez did, in the few seconds that I have, made some reference into whether or not she was just merely present or an aider and abetter. And that's not something that was brought up on her appeal. But there is evidence that she was not just merely present. She was not just a passenger. As we discussed earlier, she did know that she was smuggling in an alien in the dashboard. She did know she was going to be paid money to do this. And when she approached the vehicle as a passenger at primary inspection, she didn't inform the inspector, oh, I have an individual in the dashboard compartment, I want to present her to you. She didn't say that. In fact, she did, she aided in the sense that she was giggling and conversing with Estrada to distract the primary inspector. She they We certainly know all those facts. And your time is up. So thank you. Thank you. I could just briefly address the issue of the plea agreement. And the record that the file that I received from trial counsel included the copy of the plea agreement that I included in my excerpt of record. It appears that that was not the actual plea agreement. Well, to the extent that the change was to move from a package deal to a deal just for Estrada, that's self-evident, isn't it? It is. And so I don't think that's an issue. I'm not concerned about that. I think that it's probably likely that Ms. Martinez will be deported immediately after serving her sentence. That's, in my experience, that's what happens unless she were able to, unless she had the funds to hire an immigration lawyer who perhaps could somehow get her bail or some kind of a stay. And then just finally to address the issue about the allegation and the indictment, that special allegation. I think it's pretty clear that by the time of trial, anyway, we knew that the sentencing guidelines were advisory and the government didn't have to prove that, the reckless endangerment as an element of the offense. And I don't think the government claims that either. So I don't think there's any issue that that evidence of the material witness being hot and sweaty, that that certainly didn't go to an element of the offense. And unless there's any further questions, I'll let you go. Thank you both. Thank you all. Excuse me for your argument. The matter just argued will be submitted in the law.
judges: Fernandez, Rymer, Clifton